UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. SI-4:07CR656DJS(MLM) |
| ) | |
| AVERY WEST AND ) | |
| KIMBERLY WEST, ) | |
| Defendants. ) | |

**REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE
CONCERNING ELECTRONIC SURVEILLANCE**

This matter is before the court on defendant Avery West's Motion to Suppress the Contents of Any and All Electronic Surveillance [Doc. 113] and defendant Kimberly West's Motion to Suppress the Fruits of Illegal Electronic and Other Surveillance [Doc. 118].[1] The government responded. [Doc. 130]

On April 18, 2008 a hearing was held on the Motions to Suppress Electronic Surveillance evidence. Avery West and Kimberly West were present in person and represented by counsel Paul D'Agrosa and Paul Sims, respectively. The government was represented by Assistant United States Attorney Sirena Wissler.

The government's documentary evidence was presented in two large binders. Gov.Ex.1 and 2. Defendants stipulated to the authenticity of all of the government's documentary evidence. Defendants do not challenge the Pen Registers or Trap and Trace devices, except as they relate to "necessity," which will be discussed below. Gov.Ex.1, tabs

---

[1] Both Avery West and Kimberly West filed Motions to Suppress Evidence other than electronic surveillance evidence. These Motions will be taken up in a separate R&R. Defendant Nathaniel Peterson filed a Motion to Dismiss the Indictment which will be taken up in another separate R&R. All of the other defendants in this case have waived pretrial motions or withdrawn pretrial motions.

1-8. The court finds that the Pen Registers and Trap and Trace devices including enhanced caller identification comply all respects with the applicable law.[2]

Defendants do not challenge the documentary support for the wiretap on the target phone: (314) 584-0775. Gov.Ex.1, tabs 9-15; Gov.Ex.2, tabs 1-15. However, some background information is appropriate.

On July 14, 2006, United States District Judge Rodney W. Sippel signed an order authorizing interception of wire communications occurring over telephone number (314) 584-0775 for a period of thirty (30) days. Gov.Ex.1, tab 11. The Application was executed by Assistant United States Attorney Sirena M. Wissler. Gov.Ex.1, tab 9. The Application was accompanied by a 61 page Affidavit signed by Special Agent Brandon Moles of the Drug Enforcement Administration. Gov.Ex.1, tab 10. On July 21, 2006 the United States filed

---

[2] "A pen register is a mechanical device that records the numbers dialed on a telephone by monitoring the electrical impulses caused when the dial on the telephone is released. It does not overhear oral communications and does not indicate whether calls are actually completed." United States v. New York Tel. Co., 434 U.S. 159, 161 n.1 (1977).

"The installation and use of a pen register ... [is] not a 'search'" within the meaning of the Fourth Amendment and therefore does not violate the constitution. Smith v. Maryland, 442 U.S. 735, 745-46 (1979); United States v. Fregoso, 60 F.3d 1314, 1320 n.3 (8th Cir. 1995).

With regard to the enhanced caller identification, the Eighth Circuit has clearly held that the caller identification service is a "trap and trace device" as that term is defined in 18 U.S.C. § 3127(4). Fregoso, 60 F.3d at 1320. A trap and trace device is "a device which captures the incoming electronic or other impulses which identify the originating number of an instrument or device from which a wire or electronic communication was transmitted." 18 U.S.C. 3127(4).

Defendants do not raise the issue of the validity of the installation of the pen registers or trap and trace devices. Even if they had raised the issued, 18 U.S.C. § 3122 is merely a safeguard against the random use of the devices by requiring compliance with the statutory scheme. It requires only the installation be relevant to an on-going criminal investigation. Hallmark, 911 F.2d at 402.

its first and final ten day report, in which it provided an accounting of the number of calls intercepted, the number of calls minimized, and a representative sample of linesheets for intercepted calls. Gov.Ex.1, tab 13.

On or about July 20, 2006 the investigative team learned that the service to target telephone #1, that is (314) 584-0775, had been disconnected for non-payment. Therefore, on July 21, 2006 Judge Rodney W. Sippel signed an Order Sealing the electronic communications intercepted over target telephone #1. Gov.Ex.1, tab 15.

On or about July 23, 2006 the service to target telephone #1 was restored. On July 27, 2006 United States District Judge Catherine D. Perry signed an Order authorizing interception of wire communications occurring over target telephone #1 for a period of thirty days. Gov.Ex.2, tab 3. The Application was executed by Assistant United States Attorney Sirena M. Wissler. Gov.Ex.2, tab 1. The Application was accompanied by a 65 page Affidavit signed by Special Agent Brandon Moles of the Drug Enforcement Administration, which detailed the investigation and the circumstances surrounding the sealing of the earlier wiretap on target telephone #1. Gov.Ex.2, tab 2.

The United States filed Ten Day Reports on August 10th, (Gov.Ex.2, tab 5) and August 17, 2006 (Gov.Ex.2, tab 6). On August 25, 2006 Judge Catherine D. Perry signed an order extending for an additional thirty days the period of authorized interceptions of electronic communications occurring over target telephone #1. Gov.Ex.2, tab 9. On August 28, 2006 the United States filed its third Ten Day Report (Gov.Ex.2, tab 10), its fourth on September 5, 2006 (Gov.Ex.2, tab 11) and its fifth on September 14, 2006 (Gov.Ex.2, tab 12). The sixth and final Ten Day Report was filed on September 27, 2006 (Gov.Ex.2, tab 13). Judge Perry ordered the wire sealed on September 27, 2006 (Gov.Ex.2, tab 15).

Title III of the Omnibus Crime Control and Safe Streets Act of 1968 codified at 18 U.S.C. § 2501, *et seq.*, which provides for the interception of wire, oral or electronic communications, specifically permits an "aggrieved person" to move to suppress the contents of such interceptions on grounds that:

    (i)    the communication was unlawfully intercepted;

    (ii)    the order of authorization or approval under which it was intercepted is insufficient on its face;

    (iii)    the interception was not made in conformity with the order of authorization or approval.

18 U.S.C. § 2518(10)(a). This section also provides that upon filing such a motion, such portions of the intercepted communications or evidence derived therefrom shall, as the judge determines to be in the interests of justice, be made available to the aggrieved person. As an initial matter, in the present case, the government has made available to counsel for defendant all the documentary evidence as well as all of the intercepted communications. The court finds that this portion of the statute has been meticulously observed by the government.

Title III sets forth a comprehensive legislative scheme regulating the interception of oral and wire communications. "This legislation attempts to strike a delicate balance between the need to protect citizens from unwarranted electronic surveillance and the preservation of law enforcement tools needed to fight organized crime." United States v. Phillips, 540 F.2d 319, 324 (8th Cir. 1976). The statute provides for the interception of wire, oral and electronic communications only under certain circumstances and only if specific procedures are followed.

**The court finds that all the procedures for authorization, application, affidavit(s), court order to service providers, extensions, Ten Day Reports and sealing have been followed meticulously. Although not challenged by defendants, the court finds the affidavits clearly establish probable cause for the installation(s) of the wiretap.**

**A.     Necessity**

**The only things challenged by the defendants are the "necessity" for the wiretap, that is, whether "other investigative procedures" were tried and failed or were unlikely to succeed.[3]**

**Pursuant to 18 U.S.C. 2518(1)(c), the Affidavit fleshes out the Application on the issue of "whether or not other investigative procedures have been tried and failed or why they reasonably appear unlikely to succeed if tried or to be too dangerous." Id. The wiretap should be necessary and reasonable, however, "... investigators need not exhaust specific or all possible investigative techniques before a court can issue a wiretap order." United States v. Jones, 801 F.2d 304-314 (8th Cir. 1986). See also United States v. Macklin, 920 F.2d 1320, 1326-27 (8th Cir. 1990), cert.denied, 489 U.S. 1031 (1991); United States v. Smith, 909 F.2d 1164, 1166 (8th Cir. 1990), cert. denied, 498 U.S. 1032 (1991).**

> **[The Eighth Circuit] held in United States v. Daly, 535 F.2d 434, 438 (8th Cir. 1976) that the necessity requirement of Section 2518 was meant to insure that wiretaps are not routinely employed as the initial step in an investigation. Thus while the statute does require that normal investigative procedures be used first, it does not require that law enforcement officers exhaust all possible techniques before applying for a wiretap. [United States v.] Leisure, 844 F.2d [1347,] 1356 [(8th Cir.), cert. denied, 488 U.S. 932 (1988)]; United States v. O'Connell, 841 F.2d 1408, 1415 (8th Cir.), cert.denied, 487 U.S. 1210 (1998)...the government is simply not required to use a wiretap only as a last**

---

[3] **Defendant Avery West also challenges whether the calls were appropriately minimized. That issue will be taken up below.**

resort.  United States v. Matya, 541 F.2d 741, 745 (8th Cir. 1976), cert.denied, 429 U.S. 1091 (1977).

United States v. Macklin, 902 F.2d 1320, 1326 (8th Cir. 1990), cert.denied, 489 U.S. 1031 (1991).

In the Affidavit the government describes in detail the other investigative techniques employed: surveillance, telephone records, federal grant jury subpoenas, confidential informants and sources, undercover agents, interviews with associates, search warrants, trash covers, and prior judicially authorized intercepts. SA Moles' Affidavit considers each of these nine alternative techniques in turn, and indicates why these techniques, alone or in combination, had failed or were reasonably believed to be too dangerous to attempt. It is clear that the wiretap in the instant case was not "employed as the initial step" in the investigation as defendants have urged. To the contrary, the investigative team considered and either attempted or rejected as unacceptably dangerous a number of other techniques with the goal of uncovering the scope of the charged conspiracy and the participants in that conspiracy. This type of effort clearly meets the requirements of 18 U.S.C. § 2518.

1.      **Surveillance**

The agents attempted physical surveillance on numerous occasions during the investigation. It proved valuable in identifying some activities and associates of Chad Brown, Avery West, Bryce Fowler, Maurkeith Patton, Antonio Taylor, William Thomas, Corrian Hardy, Lawrence Woods, Trent Williams, Gary Hayden, Glenn Harvey and others. Physical surveillance, if not used in conjunction with other techniques, is of limited value. Even where physical surveillance is successful, it does not yield sufficient evidence of the criminal activity under investigation.

**Physical surveillance is also unlikely to establish conclusively the roles of the named conspirators, to identify additional conspirators or to otherwise provide admissible evidence in regard to the investigation. Narcotics traffickers who have achieved the level of the Target Subjects are extremely conscious of law enforcement surveillance efforts. Therefore, if surveillance were increased, it would alert the Target Subjects to the existence of the investigation and cause them to relocate and/or temporarily cease their illegal activities, thereby hindering the investigation.**

**In addition, the nature of the neighborhoods in which Avery West operates (Kinlock, Missouri and Berkley, Missouri) forecloses physical surveillance as they are close knit communities and any activity out of the norm would be detected by West or West's associates engaged in illegal drug activity. Therefore, while surveillance was used, it had to be used with discretion in order not to compromise the investigation.**

**For example, on March 25, 2006, investigators met with Confidential Source #1 (CS) who had made arrangements with Avery West by calling the target telephone to purchase an ounce of crack for $800. Although investigators were able to maintain surveillance of the transaction, the surveillance cars were by necessity several blocks away creating a serious security risk to both law enforcement and CS #1. On April 7, 2006, CS #1 agreed to meet Avery West at a Mobil service station for the purpose of purchasing one ounce of crack cocaine from Avery West. After the transaction had concluded Avery West drove away and made a series of maneuvers that were, based on the investigators' training and experience, consistent with counter-surveillance. Investigators were only able to maintain surveillance until the vehicle reached the city limits of Kinlock, Missouri. These examples are by way of illustration and not exclusive. The Affidavit is replete with numerous other examples.**

**2.     Telephone Records**

Telephone toll records and pen registers and trap and trace devices were use extensively during the investigation. They cannot enable DEA to identify with certainty the persons involved in committing the target offenses. Among other problems, a telephone number appearing in the records may not be listed or subscribed to in the name(s) or address(es) of the person(s) utilizing the telephone. It is to be noted that Target Telephone #1 is not listed or subscribed to Avery West. In addition, the records do not reflect the content of any conversations.

**3.     Federal Grand Jury Subpoenas**

The use of a Federal Grand Jury was not a promising method investigation in this case. The issuance of Grand Jury subpoenas could not lead to the discovery of critical information and undoubtedly would alert the Target Subjects to the existence of the investigation. Witnesses who might provide relevant information to a Grand Jury could perhaps be themselves participants in narcotics trafficking and would thus face prosecution. It is unlikely therefore that those individuals would testify before the Grand Jury. It is anticipated that these individuals would invoke their Fifth Amendment rights not to incriminate themselves. A grant of immunity to compel testimony was not advisable because it could result in a gross miscarriage of justice because the individuals might escape responsibility for their offenses. In addition there was some likelihood that the individuals would prefer to ignore the Grand Jury's subpoena, even upon penalty of contempt, rather than appear and testify. There was no guarantee that the targets of the investigation, even if they did respond to Grand Jury subpoenas, would testify truthfully.

**4.     Confidential Informants and Cooperating Sources**

The investigation involved the use of several Confidential Informants.  They only provided information regarding some of the Target Subjects and were not privy to all of the illegal activities.  Narcotics organizations are generally highly compartmentalized and it is generally difficult if not impossible for an informant to gain access to all aspects of an organizations' illegal activities.  Narcotics organizations jealously guard the identity of their sources of supply and the Confidential Informants/Sources used were not likely to develop evidence about the sources of supply.

Non-exclusive examples include the fact that CS #1 was capable of purchasing ounce quantities of crack cocaine from Avery West on a consistent basis however, CS#1 was unable to procure larger quantities and Avery West never confided to CS#1 his source of supply.  CS#2 was acquainted with Avery West but there were no direct dealings between the two for quite some time.  CS#3 was unable to purchase crack cocaine directly from Avery West, rather, made controlled purchases from Otis Fowler.  CS#4 and CS#5 are incarcerated.

**5.     Undercover Agents**

Based on the training and experience of the narcotics investigators they had no expectation that an undercover officer would be able to determine the full scope of the Target Subjects' operations, meet and identify other Target Subjects and potential co-conspirators or identify the Target Subjects' source of supply.  They were unable to infiltrate the inner-workings of the conspiracy.  CS#1 and CS#2 were not in a position to make introductions of undercover agents and thus the attempted insertion of an undercover officer would involve unacceptable security risks.

**6.      Interviews with Associates**

SA Moles' Affidavit indicates that he believed that interviews of the subjects or their known associates would produce insufficient information as to the identities of all the persons involved in the conspiracy, the source of the drugs and financing, the location of records, drugs, etc. and other pertinent information regarding the named crimes. SA Moles also stated that any such interviews would yield untruthful information thereby diverting the investigation with false leads or otherwise frustrating the investigation. In addition, such interviews would have the effect of alerting the members of the conspiracy, compromising the investigation and resulting in the possible destruction or concealment of documents and other evidence and the possibility of harm to cooperating sources whose identities might become known.

**7.      Search Warrants**

Some search warrants were, indeed, executed and relevant evidence procured. However, the further use of search warrants would not in all likelihood yield a considerable quantity of narcotics or money. It was unlikely that all or even many of the principals of the organization would be at any one location when a search warrant was executed and SA Boles believed that search warrants would be more likely to compromise the investigation by alerting the principals to the investigation and allowing other unidentified members of the conspiracy to insulate themselves further from successful detection.

**8.      Trash Covers**

Based on the location and physical characteristics of Avery West's residence, SA Boles believed that it would be logistically and practically difficult to accomplish a trash cover without being detected.

**9.    Prior Judicially Authorized Intercepts**

As discussed in paragraph 13(b) of SA Boles' Affidavit, Avery West was believed to have been intercepted during the judicially authorized interception of wire communications over telephone numbers (314) 744-1346 and (314) 226-5329 utilized by Corey Cox. However, at the time of the interceptions, the group conducting that investigation was unaware of Avery West or his connection to the "Black Mafia Family", a/k/a "BMF". In addition, the interceptions were vague and did not reveal the full scope of Avery West's involvement in the Corey Cox drug-trafficking organization. Once investigators became aware of Avery West's identity, it became immediately clear that he was more closely tied to the Chad Brown and BMF[4] investigation than to Corey Cox. A strategic decision was made not to attempt to spin off onto Avery West's telephone at that time.

In this case, the Affidavit explains why some procedures would likely fail in this case. The statute does not require more. <u>Macklin</u>, 102 F.2d at 1327. Some of the investigative techniques, while initially successful, failed to reveal the full scope of the conspiracy or present sufficient evidence against known participants. <u>United States v. O'Connell</u>, 841 F.2d 1408, 1415 (8th Cir. 1988), <u>cert.denied</u>, 488 U.S. 1011 (1998)(wiretap necessary even though much evidence had been collected prior to wiretap authorization; information revealed far-flung conspiracy which presented more difficult investigative problems.) In the present case, the Affidavit sets out precisely what was tried, how successful it was and what was not tried and why not. The necessity for a wiretap was fully demonstrated.

---

[4]    The Black Mafia Family (BMF) was identified as a large scale cocaine and money laundering organization. The co-conspirators in that organization are presently indicted and awaiting trial in the Eastern District of Michigan.

United States v. Shaw, 94 F.3d 438, 441 (8th Cir. 1996), cert.denied, 514 U.S. 1100 (1997). The electronic surveillance evidence should not be suppressed on lack of "necessity" grounds.

B.    Minimization

Defendant Avery West claims that the electronic communications should be suppressed because a low percentage of calls were minimized. He cites to each of the Ten Day Reports and sets forth the percentage of calls minimized. He does not, however, cite to any particular conversations which he claims should have been minimized. It is not clear what the significance of percentages has to do with constitutional safeguards and defendant cites no case law indicating acceptable or unacceptable percentages of minimized calls.

See, Scott v. United States, 436 U.S. 128, 140 (1978) (the interception of even a relatively high percentage of non-pertinent calls is an inaccurate indicator of whether or not the government complied with the minimization requirement).

> 18 U.S.C. § 2518(5) provides:
>
> Every order and extension thereof shall contain a provision that the authorization to intercept...shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter... . In the event the intercepted communication is in a code or foreign language and an expert in that foreign language or code is not reasonably available during the interception period, minimization may be accomplished as soon as practicable after such interception.

Judge Sippel's Order authorizing the wiretap contained such a minimization requirement. Gov.Ex.1, tab 11 at 5-6; Judge Perry's Order, Gov.Ex.2, tab 3 at 5-6.

In order to comply with the minimization directives, all law enforcement personnel involved in monitoring conversations pursuant to court ordered electronic surveillance

were given specific instructions prior to beginning their monitoring as to the types of conversations to be intercepted and the types to be minimized and the methods for doing so. Gov.Ex.1, tab 4; Gov.Ex.2, tab 4. All of the agents who monitored the wire in this case were required to read this letter and sign, indicating they understood the terms and conditions of the judge's Order. There was also a face-to-face meeting between the agents and the government's attorney at which the minimization requirements were further explained. Absent some specific evidence of inadequate minimization training or of calls which should have been minimized one must conclude that the agents complied with the minimization requirements of the statute. See United States v. Homick, 964 F.2d 899, 903 (9th Cir. 1992); United States v. Ozar, 50 F.3d 1440, 1447-48 (8th Cir.), cert.denied, 116 S.Ct. 193 (1995).

> Furthermore, even if the surveillance in this case did reflect the failure to minimize, it would not follow that Congress intended that as a consequence all the evidence obtained should be suppressed. ... Clearly Congress did not intend that evidence directly within the ambit of a lawful order should be suppressed because the officers, while awaiting the incriminating evidence, also gathered extraneous conversations. The non-incriminating evidence could be suppressed pursuant to 18 U.S.C. § 2518(10)(a), but the conversations the warrant contemplated overhearing would be admitted. If [defendant]. . .[has] any remedy under Title III other than suppression of conversations outside the warrant's scope, it lies in Section 2520 as a civil suit against the investigating officers alleging that they exceeded their authority.

United States v. Cox, 462 F.2d 1293, 1301-02 (8th Cir. 1972), cert.denied, 417 U.S. 918 (1974). The court has no evidence of any non-minimized, non-pertinent or privileged conversations and therefore finds that the Motion to Suppress on lack of minimization grounds should be denied.

Accordingly,

**IT IS HEREBY RECOMMENDED** that defendant Avery West's Motion to Suppress the Contents of Any and All Electronic Surveillance be **DENIED**. [Doc. 113]

**IT IS FURTHER RECOMMENDED** that defendant Kimberly West's Motion to Suppress the Fruits of Illegal Electronic and Other Surveillance be **DENIED**. [Doc. 118]

The parties are advised that they have eleven (11) days in which to file written objections to this report and recommendation pursuant to 28 U.S.C. §636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. See <u>Thompson v. Nix</u>, 897 F.2d 356 (8th Cir. 1990).

<u>/s/Mary Ann L. Medler</u>
**MARY ANN L. MEDLER**
**UNITED STATES MAGISTRATE JUDGE**

Dated this <u>  16th  </u> day of  May, 2008.