UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 4:07CR656DJS(MLM) |
| | ) |
| AVERY WEST and | ) |
| KIMBERLY WEST, | ) |
| | ) |
| Defendants. | ) |

**REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE
CONCERNING SUPPRESSION**

This matter is before the court on defendant Avery West's Motion to Suppress Illegally Seized Evidence [Doc. 111] and defendant Kimberly West's Motion to Suppress Illegally Seized Evidence [Doc. 122].[1] In addition, the government has filed a Motion for Pretrial Determination of Admissibility of Arguably Suppressible Evidence [Doc. 90]. This Motion has been granted by numerous hearings resulting in Reports and Recommendations and the district court's eventual final determinations and therefore requires no further discussion.

Two hearings were held in conjunction with defendants' Motions to Suppress. At the first hearing on April 21, 2008, the government presented the testimony of Josh Davis and Jeff Seerey, both Detectives with the City of Berkley, Missouri Police Department, and detached to the North County MEG Unit. Following the hearing defendants requested a continuance in order to subpoena witnesses. At the second hearing on May 9, 2008, defendants presented the testimony of Ruby Underwood, Kenishia Noah, Kevin Burgdorf

---

[1] Defendant Kimberly West has filed other pretrial motions in the nature of discovery motions which will be taken up in another R&R.

and defendant Kimberly West (f/k/a Kimberly Brown). Based on the testimony and evidence adduced and having had an opportunity to observe the demeanor and evaluate the credibility of the witnesses, the undersigned makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

A.     The Government's Case

**Detective Josh Davis** testified that on October 26, 2005 he and other officers of the North County MEG Unit were conducting surveillance of 1904 Mantilla, in Florissant, Missouri, because they believed there was narcotics activity being conducted there. They had information that it was the residence of defendant Avery West. They arrived at approximately 11:00 A.M. During the surveillance they observed a white Pontiac Grand Prix arrive at the residence. A black male exited the car and knocked on the side door of the residence. Det. Davis was familiar with defendant Avery West (whom he knew by the nickname "Pig") and observed him exit the house with a brown paper bag in his hand. He saw defendant Avery West hand the bag to the black male and the black male handed what appeared to be United States currency to defendant Avery West. The black male put the bag in the trunk of the white Grand Prix, then both men entered the residence. After about five minutes the black male left the house, entered the white Grand Prix and left the area. Det. Davis notified the other surveillance officers who followed the white Grand Prix to a residence in Castle Point. The black male entered the residence. The officers knocked on the door of the residence, a woman answered and they explained that they had seen a black male enter and they believed he had just been involved in a drug transaction. The woman signed a consent to search form and the officers located the black male who was trying to stuff the brown bag down into the couch. The bag contained about 5 ounces of what was

later tested and proved to be cocaine. The black male was advised of his <u>Miranda</u> rights, which he waived, and admitted he bought the cocaine from "Pig" for $3,000.00.

The officers decided to get a Search Warrant for defendant Avery West's residence at 1904 Mantilla. Det. Davis took the black male who had occupied the white Grand Prix to the St. Ann Police Department and returned to his office to draft the Search Warrant.

While Det. Davis was drafting the Search Warrant, other MEG Unit officers, including Det. Jeff Seerey, maintained surveillance on 1904 Mantilla. At approximately 4:45 P.M. Det. Seerey saw defendant Avery West come out of the residence with an older black male whom they recognized as Jerry Underwood. They entered a red Pontiac Grand Am and left. They traveled toward Charbonnier. Det. Seerey contacted the Florissant Police Department and asked them to stop the red Grand Am. At approximately 5:00 P.M. both defendant Avery West and Jerry Underwood were detained and were booked at 5:10 P.M. according to the booking sheet. Det. Seerey informed defendant Avery West that he believed defendant had just conducted a drug transaction and that they were attempting to get a Search Warrant for his house at 1904 Mantilla.

Meanwhile, Det. Davis was drafting the Search Warrant. At approximately 7:00 P.M. he presented the Application and Affidavit to prosecutor Steven McDonald. It took approximately 30 minutes to drive from the prosecutor's home to the home of Judge Ellen Levy Siwak of the St. Louis County Circuit Court. She signed the Search Warrant at 7:45 P.M. <u>See</u> Gov.Ex.3.[2]

---

[2] It is to be noted that defendants do not challenge the probable cause as articulated in the Affidavit in Support of the Search Warrant. Nevertheless, briefly, and to assist the District Court, the Affidavit describes the residence at 1904 Mantilla with particularity and states the object of the search as "powder cocaine and paraphernalia utilized in the use and distribution of controlled substances, papers reflecting the sale of controlled substances and the U. S. currency derived from the sale of controlled

As Det. Davis was walking out of Judge Siwak's home, immediately after the Search Warrant was signed, he called the surveillance officers by means of his Nextel push-to-talk device and informed them the Warrant was signed and he was on the way with it. He testified that he did not believe the other officers waited for him to get there because they were already inside the house when he arrived. His report says the Warrant was executed at "19:35," that is, 7:35 P.M. He testified he estimated the time five days later when he prepared his report. The government's Response says it was a typographical error, that is, he typed a "3" instead of a "4".

**Detective Jeff Seerey** testified[3] he began his surveillance of 1904 Mantilla at about 11:00 A.M. on October 26, 2005. He did not see the transaction in the driveway between the black male in the white Grand Prix and defendant Avery West. He was told of the transaction and when the Grand Prix left he followed it to Castle Point. He described the interview with the black male as set out above and noted that when they obtained the cocaine which defendant Avery West sold to the black male, they decided to get a Search Warrant for 1904 Mantilla. Det. Seerey and others returned to 1904 Mantilla and re-

---

substances." It sets out Det. Davis' credentials and indicates that on October 15, 2005 he received information from a reliable Confidential Informant ("CI") that Avery West (with his date of birth and Social Security number) was selling cocaine from his residence at 1904 Mantilla. Record checks indicated that Avery West had prior arrests for 9 felonies (all listed), 2 misdemeanors and notes that Avery West was then on probation for Illegal Narcotics. It states that on October 26, 2005 officers of the North County MEG Unit were conducting surveillance of the residence and observed the white Pontiac Grand Prix driven by a black male, later identified as [the name has been redacted]. The Affidavit goes on to describe the drug transaction in the driveway between defendant Avery West and the black male as described in the testimony of Det. Davis above. The individual led the officers to the cocaine, it was seized and tested positive for the presence of cocaine. The black male told the agents that he had purchased the cocaine from "Pig" for $3,000 and that "Pig" had substantial amounts of cocaine in the residence. Based thereon, the Honorable Ellen Levy Siwak signed the Search Warrant at 7:45 P.M. <u>See</u> Gov.Ex.1, 2 and 3.

[3] Det. Seerey's testimony repeats in part the testimony of Det. Davis.

established surveillance. They observed a red Grand Am driven by an older black male arrive at the residence. They recognized the driver as Jerry Underwood. He remained at the residence for a while and then Underwood and defendant Avery West left in the red Grand Am and traveled towards Charbonnier. The Florissant Police Department was contacted and asked to stop the red Grand Am. They stopped the vehicle on north Lindbergh just south of Charbonnier. Both defendant Avery West and Jerry Underwood were detained at approximately 5:00 P.M. Det. Seerey followed the vehicle as well and after the Florissant Police removed the subjects from the car, Det. Seerey told defendant Avery West they were seeking a Search Warrant for his residence. Both subjects were booked by the Florissant police at 5:10 P.M.

At approximately 5:00 P.M. Det. Seerey went back to Mantilla to assist in the surveillance. Eventually he observed an orange Grand Prix owned by defendant Avery West arrive at the residence. It was driven by a black female in her mid-twenties or thirties with whom they were not familiar. The officers were not sure who was in the house or who had observed the stop and detention of defendant Avery West and Jerry Underwood. They decided to contact the driver of the orange Grand Prix. They approached the house. They were dressed in plain clothes with badges around their necks. They identified themselves as police officers and another female, apparently hearing the commotion, came out of the side door of the house. They recognized her as Kimberly Brown (now known as Kimberly West). The officers could see into the residence through the open side door and observed other subjects in the house. They asked them to come outside and identify themselves. One was a rehabber and the other was Reginald Brown. They ran their records and because all had outstanding warrants except defendant Kimberly West, they were handcuffed and detained. While outside Det. Seerey explained to defendant Kimberly West that defendant

Avery West had been detained and that they were in the process of obtaining a Search Warrant for the residence.

Defendant Kimberly West said she was cold and asked to go back inside. Det. Seerey told her that she could but that they would have to with her. They remained in the game room (the garage had been re-modeled into a game room). Det. Seerey testified several times on direct and cross that none of the officers entered until they went in with defendant Kimberly West and no one searched the residence until they received word from Det. Davis at 7:45 P.M. that the Search Warrant had been signed. The actual search took approximately 1 hour and they used a narcotics canine to assist in the search. Cocaine was located in the bathroom, the master bedroom and the basement ceiling.

B.  Defendants' Witnesses

At the hearing on May 9, 2008 defendant Avery West called **Ruby Underwood** to testify. She is the wife of Jerry Underwood referred to above. She said that on October 26, 2005 her husband was on house arrest on supervised release on federal charges for trafficking in cocaine. He was supposed to be at home but was not. She knew he had gone to his cousin's house, that is, defendant Avery West's, so she took her three children and "went looking for him" between 4:00 and 4:30 P.M. When she arrived at 1904 Mantilla she saw some cars and three or four white males outside the house. One, leaning out of a grey truck, had a gun on his side. She saw the open side door but could not see inside. She parked on a side street and sent her 10 year old son to find his father. He went to the side door and a white male walked to the door with him. She did not see "Police" or "DEA" on any of the men. Her son returned and said his father was not there. She testified she has known defendant Avery West all his life.

The court finds that Ruby Underwood's testimony that she arrived at 1904 Mantilla between 4:00 and 4:30 P.M. is not credible. She gave no reason for recalling the specific time of an event 2-1/2 years ago. It is inconsistent with the arrest at approximately 5:00 P.M. and booking of defendant Avery West and her husband at 5:10 P.M. after which Det. Seerey returned to Mantilla and the officers approached the house. Her inability to see "Police" or "DEA" from a side street is reasonable since the officers testified they were in plain clothes and wore badges not raid jackets.

Defendant Avery West also called **Kenishia Noah**. She said that on October 26, 2005 she was at defendant Avery West's house since 9:00 A.M. She did not know the address but she knew how to get there. She left at approximately 3:10 P.M. to get her 6 year old son off the school bus, which arrived at 3:40 P.M. She took him home and returned to Avery West's house at approximately 4:20 - 4:30 P.M. She was driving an orange Grand Prix. As she pulled in the driveway she was approached by three SUV's, that "came across the grass." Three men came up the drive way and ordered her out of the car. She said she did not see any ID on the men. She asked "Who are you?" The men did not pull a gun on her. She testified she ran to the side and kicked the side door in. Later she testified they told her to get on the ground in the driveway by the front door, then they ran and she heard them kick in the side door . She said they got her up and walked her from the car to the side door which was open. As they went in they told her to lean on the pool table. She said defendant Kimberly West was sitting on a bar stool, trying to call 911, however an officer grabbed the phone from her. She said they took the white guy (a rehabber who was working at the house) and Reginald Brown out of the house. She said the officers went farther into the house but she could not see them. She told Kim to call the police and she heard cabinets slam in another part of the house. She testified she told the officer who was

slamming the cabinets that "This is illegal without a Search Warrant" and he told her that it was on the way. She said she was there 40-45 minutes until the Florissant Police came to arrest her on warrants, which she admitted. She arrived at the Florissant Police Station at approximately 6:00 P.M. Reginald Brown was arrested before she was and the white worker left before the arrests.

On cross examination she has said she has known defendant Avery West all her life and known defendant Kimberly West for the seven or so years Kimberly and Avery had been together. She said defendant Avery West picked her up after she sent her kids off to school and she stayed at his house all day. After she picked up her son and dropped him off, she pulled up to the front door and had intended to go in the front door of the residence with the key on the key chain. She claimed to be able to see the side door being kicked in from the area of the front door. She employed defendant Kimberly West's attorney and another attorney to take care of her warrants.

The court finds, and the record supports, that Ms. Noah's testimony lacks credibility in certain respects. Her testimony can reasonably described as "all over the place" and her friendship with both defendants makes it less than reliable. Her time frames are internally inconsistent. She said she returned to the residence around 4:20-4:30 P.M. However she said she was there 40-45 minutes and arrived at the Florissant Police Station at 6:00 P.M. That puts her arrival at approximately 5:15 P.M.

**Kevin Bergdorf** testified he is now a private investigator. His prior experience consists of 30 years in law enforcement. He was retained by defendant Avery West's previous lawyer, Joel Schwartz, to take photos of the interior and exterior of 1904 Mantilla and to interview neighbors to determine if the events of October 26, 2005 were "OK." He was told there was a misunderstanding about the warrant which was signed after the

search. He responded to the residence on October 27, 2005 and took photographs. See Def.Ex.A, B, C, D and E. Although the date stamp on the photos says "10/28/05", Mr. Bergdorf explained he had changed the batteries in his digital camera and had not re-set the date. He did not say what type of camera reacts in such manner. He said photos B and C show the side door with what appears to be a partial boot print on the door. Mr. Bergdorf testified as to his knowledge of the type of apparel and combat-type footwear frequently worn by officers executing Search Warrants. He said they wear military dungarees and raid jackets. He said the boot print on the door is consistent with forced entry. He said photo D, which the court finds to be barely legible, shows damage to the door. He said his interviews of people there during the execution of the warrant show the entry was forced and not by consent. Photos A and E show that one can not see the side door if one is standing by the front door where Ms. Noah said she was told to get on the ground. Mr. Bergdorf admitted he did not know when the alleged boot print was made.

Mr. Bergdorf's testimony is somewhat credible, the date on the photos notwithstanding. His description of what officers executing Search Warrants frequently wear is interesting and undoubtedly accurate if entry is made by an entry team. However, he neglected to find out what the officers actually wore in this case. They wore plain clothes and badges around their necks, not dungarees and combat boots. The mark on the door, visible in photos B and C, could conceivably be a boot print but there is no evidence when the mark was made. Defendant Kimberly West's testimony that it was not there before October 26, 2005 is self-serving at best.

**Defendant Kimberly West** testified[4] she is the former Kim Brown, that she is now married to defendant Avery West and that she resided with him at 1904 Mantilla on October 26, 2005. She said the garage of the residence had been made into a "pool room" or game room. She said that on October 26, 2005 she was home all day. Around "3-something" she saw someone kick in the side door into the pool room. She grabbed her phone and tried to call the police but the man grabbed the phone from her. She saw Kenishia [Noah] being brought in with her arms behind her. She said one of the men had a gun to her head (defendant Kimberly West's) and said he would shoot her. She said she did not give permission for the men to enter the house and that she had not been outside the house at anytime during that day. She said that from outside the side door, if it is open, one can see the pool room and the kitchen, not any of the other rooms. On cross-examination, she admitted she shared the bedroom in which the cocaine was found.

The court finds that while Kimberly West is an articulate witness, her testimony that at approximately 3:00 P.M. she saw the door being kicked in is not even consistent with the defendants' other witnesses. Her testimony that she was never outside, did not say she was cold and wanted to go back inside the house, and did not give permission for the officers to enter can only be evaluated in light of her obvious bias and the self-serving nature of all that she said.

## CONCLUSIONS OF LAW

A criminal defendant who seeks to suppress evidence seized pursuant to a Search Warrant must make a preliminary showing that the evidence was seized without a warrant.

---

[4] Prior to defendant Kimberly Brown's testimony, the court, on the record, reminded defendant that she had a right to remain silent, that she was not obligated to testify, and that no one could force her to testify. She said she understood her rights and that after talking it over with her lawyer, it was her decision to testify.

United States v. Sacco, 563 F.2d 552, 558 (2nd Cir. 1977). Here, defendants do not assert that the warrant was not supported by probable cause and do not claim the warrant was facially deficient or invalid. Rather, the grounds for moving for suppression are that the warrant was executed before it was actually signed. Defendants base their argument in part on the time of execution listed in the Police Report (7:35 P.M.) and the time of signature recorded by the judge on the Search Warrant (7:45 P.M.). The government does not contest the discrepancy between the Police Report and the Search Warrant. However, this is clearly not an error of constitutional proportions whether it was a typographical error or whether it was a careless estimate made 5 days after the incident.[5] The officers testified consistently and admitted they approached the residence shortly after 5:00 P.M. but did not begin to search until after receiving word from Det. Davis at 7:45 P.M. that the warrant was signed.

Search Warrants to be valid must be based on a finding by a neutral detached judicial officer that there is probable cause to believe that evidence, instrumentalities or

---

[5] The defendants' Motions claim that "neighborhood interviews" establish that the officers executed the Search Warrant around 5:00 P.M. not at the time the Report indicates. Although Mr. Bergdorf testified his interviews were consistent with forced entry, he gave no more specific testimony. The government's Response states:

> However, in the report prepared by defense investigators and provided to the government, the neighbors indicate no such thing. One neighbor reported that he was not home on the evening of October 26, 2005. Another neighbor reported that the only thing he had seen was a marked Florissant Police Department vehicle at 1904 Mantilla at approximately 10:00 P.M. on October 26, 2005. A third neighbor reported that at approximately 5:00 P.M. on October 26, 2005 she saw a dark colored SUV drive across a lawn and approach 1904 Mantilla. She stated that several white males wearing plain clothes approached the house. This neighbor said that she saw a male individual standing outside the house near the north door, and that he was yelling. According to the neighbor, the male then stopped and laid down on the ground. At no time did this neighbor state that she had been inside the residence at 1904 Mantilla on October 26, 2005 nor were any statements attributed to her in the defense investigator's report that might reasonably support the claim that the warrant was executed at 5:00 P.M.

fruits of a crime, contraband or a person for whose arrest there is probable cause may be found in the place to be searched. Johnson v. United States, 333 U.S. 10 (1948); Warden v. Hayden, 387 U.S. 294 (1967); Fed.R.Crim.P. 41. The standard of probable cause for the issuing judge is whether, given the totality of the circumstances, "there is a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983). Probable cause is "a fluid concept--turning on the assessment of probabilities in particular factual contexts--not readily, or even usefully, reduced to a neat set of legal rules." Gates, 462 U.S. at 232. Applications and affidavits should be read with common sense and not in a grudging, hypertechnical fashion. United States v. Ventresca, 380 U.S. 102, 109 (1965). Information contained in applications and affidavits for Search Warrants must be examined in the totality of the circumstances presented. Gates, 462 U.S. at 230. The duty of the reviewing judge "is simply to ensure that the [issuing judge] had a `substantial basis for . . . conclud[ing]' that probable cause existed." Gates, 462 U.S. at 238-39, quoting Jones v. United States, 362 U.S. 257, 271 (1960). Once a judicial officer has issued a warrant upon a finding of probable cause, that finding deserves great deference. Gates, 462 U.S. at 236. The affidavit presented in the instant case clearly contains the "fair probability" that evidence, instrumentalities or fruits of a crime or contraband would be found at 1904 Mantilla. There is no question that there was probable cause for the search. See Fn. 2.

As an initial matter, it is not necessary that the warrant be physically in the possession of the searching officers when the search is commenced; it is sufficient if a copy is left before the officers vacate the premises. United States v. Hepperle, 810 F.2d 836, 839 (8th Cir.) (officers not constitutionally required to present copy of Search Warrant prior to commencing search where previously issued warrant was presented before officers vacated

premises), cert. denied, 483 U.S. 1025 (1987); Washington v. Simpson, 806 F.2d 192, 196 n.4 (8th Cir. 1986); United States v. Clifford, 664 F.2d 1092, 1093 n.6 (8th Cir. 1981); United States v. West, 517 F.2d 483, 485 (8th Cir.), cert. denied, 423 U.S. 948 (1975). Here Det. Davis notified the surveilling officers as soon as the warrant was signed and then immediately responded to 1904 Mantilla with the warrant. There was nothing improper about this course of conduct.

Evidence need not be suppressed because the Search Warrant was not in the agents' physical possession at the time of entry. "[T]he Federal Rules of Criminal Procedure [do not] impose an inflexible requirement of prior notice. Rule 41(d) does require federal officers to serve upon the person searched a copy of the warrant and a receipt describing the material obtained, but it does not invariably require that this be done before the search takes place." Katz v. United States, 389 U.S. 347, 356 n.16 (1967). Courts have repeatedly upheld searches conducted by law enforcement officials notified by telephone or radio once the Search Warrant issued. See e.g., United States v. Marks, 635 F.2d 436, 440 (5th Cir. 1981) (suitcases seized at the time of defendant's arrest searched by DEA agent after telephone call from DEA agent who applied for and received Search Warrant, and warrant given to defendant the day after the search); United States v. Cooper, 421 F.Supp. 804, 805 (W.D. Tenn. 1976) (federal officers searched house after told by radio that Search Warrant issued by federal magistrate and warrant arrived an hour and a half after the search started); United States v. Woodring, 444 F.2d 749, 751 (9th Cir. 1971) (police officer searched house after learning over police radio that a Search Warrant had issued and was on its way to the premises and warrant arrived an hour and a half after search started).

The court finds that the credible evidence is that the officers entered the residence at approximately 5:00 P.M. with defendant Kimberly West's permission when she

requested to go back inside because she was cold.  It is clear that they could not allow her to re-enter alone and possibly destroy incriminating evidence, especially since she knew they were obtaining a Search Warrant.  The court finds that she consented to their entry into the residence.

By analogy, persons may give up their Fourth Amendment rights by consenting to a search.  <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 222 (1973).  Such consent must be given freely and voluntarily.  <u>Id.</u>  In determining whether a consent to search was given freely and voluntarily, the court must examine the totality of the circumstances under which it is given.  <u>United States v. Mendenhall</u>, 446 U.S. 544, 557 (1980); <u>United States v. Chaidez</u>, 906 F.2d 377, 381 (8th Cir. 1990); <u>United States v. Lee</u>, 886 F.2d 998, 1000 (8th Cir. 1989), <u>cert. denied</u>, 493 U.S. 1032 (1990).  Consent to search may be given by the criminal suspect or by some other person who has common authority over the premises or item to be searched.  <u>United States v. Matlock</u>, 415 U.S. 164, 171 (1974); <u>United States v. Bradley</u>, 869 F.2d 417, 419 (8th Cir. 1989).  A search may be valid when based on the consent of a party whom the police reasonably believe to have authority to consent to the search even if it is later determined that the party did not in fact have such authority.  <u>Illinois v. Rodriguez</u>, 497 U.S. 177, 185-186 (1990).

The inquiry must then turn to whether the consent was voluntary.  The burden is on the government to show that the consent was voluntary under the totality of the circumstances.  <u>See</u> <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 248-49 (1973).  There are numerous factors a court should consider in determining whether consent was freely and voluntarily given.  <u>United States v. Chaidez</u>, 906 F.2d 377, 381 (8th Cir. 1990).  Although these factors are customarily applied to a consent to search, they are applicable to

defendant Kimberly Brown's consent to enter and are appropriately used in this analysis.

In Chaidez, the Eighth Circuit noted that:

> courts should ask whether the person who consented: (1) was detained and questioned for a long or short time, . . . (2) was threatened, physically intimidated, or punished by the police, . . . (3) relied on promises or misrepresentations made by the police, . . . (4) was in custody or under arrest when the consent was given, . . . (5) was in a public or secluded place, . . . or (6) either objected to the search or stood by silently while the search occurred.

Id. at 381 (citations omitted). Here, at the time she went back into the house she had only been detained for a very brief period. Although she testified that an officer put a gun to her head and threatened to shoot her, this evidence is not credible. The other witness who was present did not corroborate this testimony. The officers did not promise her anything or misrepresent anything to her. She was not in custody or under arrest when she consented. She was outside of her own home and she stayed inside without objecting until the Search Warrant arrived. The court finds that defendant Kimberly West consented to the entry of her residence because she was cold while they waited for the Search Warrant. The evidence eventually discovered should not be suppressed.

Nevertheless, the two hours and forty-five minutes between the entry and the search may seem excessive. United States v. Peralez, ___ F.3d ___, 2008 WL 2038805 (8th Cir. 2008) may be instructive. In Peralez, the Eighth Circuit held that a constitutionally permissible traffic stop can become unlawful if it is prolonged beyond the time reasonably required to complete its purpose. Id. at *3. The court found the delay of the defendant could not be categorized as "brief" and found that it violated defendant's right to be free from an unreasonable seizure. However, the court further determined that the constitutional violation did not cause the officer to obtain the challenged evidence. "Only if the constitutional violation was 'at least the but-for cause of obtaining the evidence' is

- 15 -

suppression of the evidence the appropriate remedy." Id. citing Olivera-Mendez, 484 F.3d 505, 511 (8th Cir. 2007). In both Peralez and Olivera-Mendez it was the dog sniff, not the prolonged delay, that caused the discovery of the contraband. By analogy, if the occupation of the residence on Mantilla for two hours and forty-five minutes is found to a constitutional violation, the evidence nevertheless should not be suppressed because it was the valid Search Warrant, not the delay, that caused the discovery of the evidence. See Peralez, 2008 WL 2038805 at *5; Olivera-Mendez, 484 F.3d at 511.

Reasonable minds could differ on the assessment of the evidence presented at the hearings. If the district court finds that the entry of 1904 Mantilla was in fact a forced entry, the exigent circumstances exception to the warrant requirement applies.

Police officers may not enter or search a home without a warrant absent exigent circumstances. See, e.g., Payton v. New York, 445 U.S. 573, 589 (1980). Under the exigent circumstances exception, the warrant requirement is suspended if lives are threatened, a suspect's escape is imminent, or evidence is about to be destroyed. Michigan v. Tyler, 436 U.S. 499, 509 (1978); Warden v. Hayden, 387 U.S. 294, 298-99 (1967); Ker v. California, 374 U.S. 23, 42 (1963); United States v. Johnson, 12 F.3d 760, 764 (8th Cir. 1993); United States v. Clement, 854 F.2d 1116, 1119 (8th Cir. 1988). "The burden is on the state to show the entry is within the exception and an objective standard is used to evaluate the reasonableness of the officer's belief that exigent circumstances existed." United States v. Selberg, 630 F.2d 1292, 1295 (8th Cir. 1980); United States v. Clement, 854 F.2d 1116, 1119 (8th Cir. 1988). The court recognizes only a few emergency conditions that fall under the doctrine of exigent circumstances. One test is "whether the exceedingly strong privacy interest in one's residence is outweighed by the risk that delay will engender injury, destruction of evidence, or escape." United States v. Diaz, 814 F.2d 454, 458 (7th Cir.), cert.

**denied**, 484 U.S. 857 (1987), quoting United States v. Acevedo, 627 F.2d 68, 70 (7th Cir.), cert. denied, 449 U.S. 1021 (1980). Where there is probable cause, the court has found exigent circumstances when evidence is in danger of destruction, Ker v. California, 374 U.S. 23, 41-42 (1963); when the police are in hot pursuit of a suspect, United States v. Santana, 427 U.S. 38, 42-43 (1976); when narcotics can be destroyed easily and quickly, United States v. Parris, 17 F.3d 227, 229 (8th Cir.), cert. denied, 114 S.Ct. 1662 (1994); or when the safety of law enforcement officers or the general public is threatened, Warden v. Hayden, 387 U.S. 294, 298-99 (1967); or the officers have an objectively reasonable basis for believing that an occupant is seriously injured or is threatened with serious injury. Brigham City, Utah v. Stuart, 126 S.Ct. 1943 (2006).

In the present case the surveilling officers did not know who was in the residence or who might have observed the stop and detention of defendant Avery West and Jerry Underwood and then warned the occupants of the residence. They had an objectively reasonable concern that the narcotics would be destroyed prior to the signing of the Search Warrant. Their occupation of the residence and their observation of the occupants to await notice of the Search Warrant's signing was reasonable under the circumstances.

Regardless of the theory of the case, if the district court finds police misconduct of any kind, it is clear that the inevitable discovery rule applies. "To succeed under the inevitable-discovery exception to the Exclusionary Rule, the government must prove by a preponderance of the evidence: (1) that there was a reasonable probability that the evidence would have been discovered by lawful means in the absence of police misconduct, and (2) that the government was actively pursuing a substantial, alternative line of investigation at the time of the constitutional violation." United States v. Conner, 127 F.3d 663, 667 (8th Cir. 1997). There is no question that there was a reasonable probability that the cocaine

would have been discovered at the execution of the validly issued Search Warrant. The officers were clearly, actively pursuing obtaining the warrant throughout the afternoon and evening of October 26, 2005. The evidence should not be suppressed.

Accordingly,

**IT IS HEREBY RECOMMENDED** that the government's Motion for Pretrial Determination of Admissibility of Arguably Suppressible Evidence be **GRANTED**. [Doc. 90]

**IT IS FURTHER RECOMMENDED** that defendant Avery West's Motion to Suppress Illegally Seized Evidence be **DENIED**. [Doc. 111]

**IT IS FURTHER RECOMMENDED** that defendant Kimberly West's Motion to Suppress Illegally Seized Evidence be **DENIED**. [Doc. 122]

The parties are advised that they have eleven (11) days in which to file written objections to this report and recommendation pursuant to 28 U.S.C. §636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

/s/Mary Ann L. Medler
MARY ANN L. MEDLER
UNITED STATES MAGISTRATE JUDGE

Dated this 28th day of May, 2008.